UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEN MOORE,

      Plaintiff,

v.                                                       Case No. 1:08-CV-966

HEXACOMB CORPORATION,             HON. GORDON J. QUIST

      Defendant.
_____/

## OPINION

Plaintiff, Ken Moore ("Moore"), filed a one-count complaint against his former employer, Hexacomb Corporation ("Hexacomb"), in Kalamazoo County Circuit Court alleging that Hexacomb violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Michigan Persons With Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1101, *et seq.*, by refusing to make a reasonable accommodation and by terminating him based on a disability which was unrelated to his ability to perform his job with a reasonable accommodation. Hexacomb removed the case to this Court, alleging federal question jurisdiction as the basis for removal.

Moore and Hexacomb have now filed cross motions for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the Court will deny both motions.

### I. BACKGROUND

Hexacomb hired Moore on September 8, 2002, at its Kalamazoo, Michigan facility, where it makes a product called "Hexacomb" that is similar to corrugated packaging materials. During his approximately five and one-half years of employment with Hexacomb, Moore worked as a forklift

driver on the third shift. Hourly production employees such as Moore were assigned one of four classifications, ranging from highest to lowest in terms of seniority and pay: (1) Natural Team Lead ($17.10 per hour); (2) Associate 1 ($14.87 to $16.00 per hour); (3) Associate 2 ($13.46 to $14.58 per hour); and (4) Associate 3 ($12.06 to $12.63 per hour). During the relevant time Moore was an Associate 2. The third shift had one other forklift driver, Richard Cavner ("Cavner"), an Associate 1 employee who drove in the shipping and receiving department.

In addition to actually sitting in and driving the forklift, Moore's duties included a number of tasks that involved climbing on and off the forklift, walking, and lifting. For example, he would often have to get off the forklift to stretch wrap a skid and then climb back on the forklift. Depending on the size of the order, a forklift driver might have to climb off and back on a forklift between 50 and 200 times per shift to wrap skids, (Moore Dep. at 44-45); he might have to walk up to 75 yards to get a new propane fuel tank for the forklift, (*id.* at 40); he would have to place runners and blocks on skids, (*id.* at 47-48, 58); and he changed stretch wrap rolls once or twice a shift and taped down loose ends of rolls of raw paper product, (*id.* at 61, 68). Moore would also occasionally assist other operators in their duties or fill in while they were on break, which usually lasted approximately 40 minutes per time twice a day. (*Id.* at 68-69; Moore Aff. ¶ 9.) According to Moore, the longest time in any given shift he spent off his forklift would have been about two hours. (Moore Aff. ¶ 5.) While working as a forklift driver Moore was never required to fill in as a line operator. (Moore Dep. at 70.)

Approximately two years after Moore began working for Hexacomb, he was diagnosed with osteoarthritis in both knees. (Moore Dep. at 78.) He began to walk with a limp was able to stand or walk continuously for only about one hour. (Moore Aff. ¶¶ 6, 8.) Standing or walking for long periods of time causes Moore intense pain and swelling in his knees. (*Id.* ¶ 5.) In spite of these

2

limitations, Moore was able to continue performing his forklift driver duties successfully and without a problem. (Haight Dep. at 19.) Although Moore never requested, nor required, an accommodation while working as a forklift driver, his supervisor, Jerry Haight ("Haight"), was aware that Moore had problems with his knees. (*Id.* at 19-20.)

In late March 2008, Mike Nadeau ("Nadeau"), the new plant manager, decided as a cost savings measure to eliminate the third shift and transfer all third shift employees to the second shift. (Moore Dep. at 76.) Because the elimination of the third shift was to be temporary, third shift workers, who were generally more senior and experienced than the second shift workers, would not replace or "bump" second shift workers. This would preserve both shifts intact based on the assumption that the third shift would eventually be restored. (*Id.* at 79.) Instead, third shift workers would be placed in second shift positions as needed. (Keown Dep. at 27-28.) Hexacomb assigned third shift employees to available second shift positions based upon their associate level, with the highest level employees, e.g., Associate 1, being given the highest level positions available on second shift. (*Id.* at 38.)

Nadeau was the decision-maker with regard to the jobs to which third shift employees were assigned. (Moore Dep. at 77, 83.) In discussing job assignments for third shift employees, Haight recommended to Aaron Nichols ("Nichols"), the second shift supervisor, that Moore be assigned a forklift driver position if possible. (Haight Dep. at 23-24.) Nichols, in turn, recommended to Nadeau that Moore be given a forklift driver position because Nichols "was concerned because of [Moore's] condition. . . That doing anything other than the fork truck driving job would put him at risk of injury." (Nichols Dep. at 21-22) Ultimately, however, Nadeau assigned Moore to a laborer position, which required Moore to stand or walk continuously for the entire 8-10 hour shift. (Moore Dep. at 77-78.) While the combination of the two shifts resulted in the creation of a new forklift

3

driver position, Nadeau assigned that position to Cavner rather than Moore based upon Cavner's higher Associate 1 level.[1] (Keown Dep. at 38; Keown 7/13/09 Decl. ¶¶ 3-5.)

Moore told Nadeau that he would have difficulty with the laborer position due to his knee condition, but Nadeau advised Moore that nothing could be done about it because there were no open forklift positions on second shift.[2] (*Id.*) Moore worked in the laborer position for one day, on April 7, 2008. After about 3-4 hours of continuous standing and walking, Moore began to develop severe pain in his knees, and he informed his supervisor of this situation.

The following day, April 8, 2008, Moore went to an appointment Hexacomb had previously made with Dr. Richard Ilka, of Borgess CorpFit Occupational Health, for a fitness for duty examination. (*Id.* at 72.) Following the examination, Dr. Ilka sent Hexacomb a report stating that Moore could return to work with the following "indefinite" restrictions: "occasional standing or walking, squatting or stairs, intermittently during the shift." Later that day, Moore met with Scott Keown ("Keown"), Hexacomb's Production and Safety Manager, and Kathy Jaglowski of Hexacom's Human Resources Department, about Dr. Ilka's report. Keown told Moore that there were no jobs available that fit Dr. Ilka's restrictions. (*Id.* at 95-96.) Moore asked Keown if a forklift driver with less seniority than Moore could be reassigned to another job so that Moore could continue working as a forklift driver, but Keown told him that was not a possibility. (*Id.* at 96.) Keown told Moore that even if he wanted to give him a forklift position, he could not perform all the duties of that position due to Dr. Ilka's restrictions. (Keown Dep. at 34.) Keown also said that

---

[1]At or around the time of the discontinuation of the third shift, Nadeau was diagnosed with cancer. He has since died and, apparently, was not deposed for this case.

[2]Moore's conversation with Nadeau in which Moore told Nadeau that he could not perform the laborer position and needed to work in a forklift driver position occurred while Moore was still working on third shift, before it was discontinued. (Moore Dep. at 82.)

because of the restrictions, he was concerned Moore might hurt himself at work and become permanently disabled. (Moore Aff. ¶ 12.) Keown sent Moore home with Family and Medical Leave Act ("FMLA") and short term disability paperwork.

Moore visited his family doctor, Dr. Tom Saad, on April 11. During that visit, Moore explained in detail the duties of his forklift driver position to Dr. Saad. Dr. Saad prepared a report stating that Moore could drive a forklift but could not stand/walk on a continuous basis during an 8 hour work day. Dr. Saad also refused to sign the FMLA forms because he believed Moore could perform the forklift driver job. (Saad Aff. ¶ 10.)

Shortly thereafter, Moore verbally requested that Hexacomb accommodate his disability by placing him back into a forklift driver position, and he confirmed his request in writing on April 23, 2008. (Letter of 4/23/08 from Moore to Hexacomb, Moore Dep. Ex. 9.) Moore supported his request with Dr. Saad's report, but Nadeau and Keown determined that Moore could not perform the duties of forklift driver due to "the constant climbing, the constant walking, getting on and off the truck multiple times an hour." (Keown Dep. at 34-35.) Although Hexacomb invited Moore to identify any job he believed he could perform with his restrictions, Moore maintained that the forklift position was the only job he could do. However, Hexacomb concluded that there were no jobs available that Moore could perform with his restrictions. (Keown Dep. at 71.)

Hexacomb treated the first 12 weeks of Moore's absence as FMLA leave. Hexacomb terminated Moore's employment at the conclusion of that period, in July 2008.

Moore filed a Charge of Discrimination on or about April 14, 2008, in which he alleged that Hexacomb failed to accommodate his disability. (Moore Dep. ex. 15.) He received his Right to Sue letter from the EEOC on or about June 12, 2008. Moore did not file another Charge of Discrimination.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

The ADA mandates that: "No covered entity shall discriminate against an individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[3] 42 U.S.C. § 12112(a). Discrimination under the ADA also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Moore contends that Hexacomb violated the ADA by failing to make a reasonable accommodation and by terminating him based on his disability.

---

[3]The PWDCRA provides similar protections, and the legal analysis under the ADA and PWDCRA is the same. *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). Therefore, he Court need only analyze Moore's claims under the ADA.

A.      **Failure to Accommodate Claim**

To establish a prima facie case of disability discrimination under the ADA based on a failure to accommodate, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) his employer was aware of his disability; (4) an accommodation was requested; and (5) the employer failed to provide the necessary accommodation. *See DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (addressing a disability claim under the Rehabilitation Act).

1.      *Disabled Under the ADA*

A disability under the ADA is defined as, among other things, "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Hexacomb not only concedes that Moore is disabled under the ADA for purposes of its summary judgment motion, but it fails to dispute Moore's assertion in his motion for summary judgment that he is disabled. Given Hexacomb's failure to dispute this issue, as well as the evidence supporting Moore's assertion that he is disabled, the Court concludes as a matter of law that Moore is disabled.

2.      *Otherwise Qualified*

Hexacomb contends that it is entitled to summary judgment because Moore was not qualified for the position of forklift driver. It asserts that Moore could not perform the duties of this position because Nadeau and Keown concluded, based on the medical restrictions imposed by Dr. Ilka, which Moore adopted as proper, that Moore could not perform the duties required of a forklift operator.

The ADA defines a "qualified individual" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Hexacomb's argument that Moore was not qualified to perform the duties of a forklift driver fails for several reasons. First, and most importantly, Moore had a record of successfully performing the forklift driver position with his disability for several years. In fact, he was performing that job without any problems at the time Hexacomb decided to discontinue the third shift, and it is reasonable to conclude that, but for the discontinuance of the third shift, Moore would have continued to perform as a forklift driver without difficulty. Such evidence is proof that a plaintiff is qualified to perform the essential functions of the job. *See Wishkin v. Potter*, 476 F.3d 180, 187 (3d Cir. 2007) (stating that "Wishkin had been performing the essential functions of the job for nearly twenty years, and there was no evidence of recent changes to his health status or ability to work that might have precipitated Wishkin's request for a physician's letter . . . . For summary judgment purposes, the District Court should not have accepted the USPS's characterization of Wishkin as not qualified based solely on the letter that he procured from a physician reluctant to grant it. "); *Wilson v. Young Windows Inc.*, No. 06-5344, 2009 WL 564955, at \*12 (E.D. Pa. Mar. 3, 2009) ("After successfully performing the job for years and excelling to the point of being awarded the 'A' rate, it is clear that Mrs. Wilson satisfied the prerequisites for the job."); *Erbel v. Johanns*, No. 3:04-CV-555, 2007 WL 1387331, at \*12 (E.D. Tenn. May 8, 2007) ("In the instant case, plaintiff has presented evidence . . . that she was otherwise qualified to perform the essential functions of her job with accommodation inasmuch as plaintiff had performed the job successfully for many years . . . ."); *Dodson v. Staples, Inc.*, No. 1:05-cv-1236-SEB-JPG, 2006 WL 3776287, at \*6 (S.D. Ind. Dec. 20, 2006) ("Mr. Dodson had never had disciplinary problems prior to this incident, and had in fact received increasingly favorable performance reviews. Thus, he had proved himself qualified to perform the essential functions of his job."); *Mastronicola v. Principi*, No. 2:04CV1655, 2006 WL 3098763, at \*4 (W.D. Pa. Oct. 30, 2006) ("Despite the fact that the VA

now claims that he performed only 30% of the duties of the food service worker job, Mastronicola has worked in that position for fifteen years, so a jury certainly could infer that he is able to perform the essential functions of his position."); *LaBrecque v. Sodexho USA, Inc.*, 287 F. Supp. 2d 100, 110 (D. Mass. 2003) ("Not surprisingly, Sodexho does not challenge LaBrecque's capacity to perform the essential function of her job with or without a reasonable accommodation. Nothing in the record indicates that LaBrecque was less than a satisfactory employee during her approximately four years with Sodexho, or that she was somehow incapable of performing the essential functions of the cashier/supervisor position at Subway."). Moreover, as noted above, both the second shift and third shift supervisors expressed the opinion that Moore should be given a forklift driver position if one were available on second shift. The fact that both supervisors recommended that Moore be given a forklift position shows that two persons familiar with the essential functions of the forklift driver position and Moore's abilities and qualifications believed that Moore was qualified to perform the essential functions of the job.

Second, although Hexacomb relies heavily upon the restrictions imposed by Dr. Ilka, nothing in the restrictions establishes that Moore could not perform the position of forklift driver. The evidence shows that Nadeau and Keown both concluded that the restrictions precluded Moore from performing the duties of a forklift driver, but nothing in Dr. Ilka's report compels that conclusion. In fact, Keown testified that he spoke with Dr. Ilka about the restrictions and he "got the feeling that [Dr. Ilka] understood that maybe Ken couldn't perform" the forklift driver job, but Keown conceded that Dr. Ilka never actually said that Moore could not perform the forklift driver position. (Keown Dep. at 35-36.)

Third, Moore's own doctor, Dr. Saad, confirmed that Moore could do the forklift driver job but could not stand/walk on a continuous basis. Nadeau and Keown apparently gave little or no

weight to Dr. Saad's opinion, even though Moore fully explained his duties to Dr. Saad.

Finally, Hexacomb points out that Keown conducted a time study to assess the actual tasks performed by a forklift driver, which showed that forklift drivers perform a variety of tasks which required the forklift driver to climb on and off the forklift. (Keown Dep. at 63-70.) Keown said that he observed a driver climb on and off a forklift seven times in ten minutes to stretch wrap a kid of material. Extrapolating from this observation, Keown concluded that a driver may be required to step on and off his forklift 860 times during the course of a shift. (*Id.* at 70, 77.) Keown and Hexacomb conclude that this study shows Moore was not qualified for the job. Moore does not dispute that he was required to perform duties involving climbing on and off the forklift; in fact, he did so during his five and one-half years doing the job. Moreover, as noted above, Hexacomb has presented no evidence showing that Moore was unable to perform the essential functions of the forklift driver position during that time. In light of Moore's performance record and the testimony of Moore's supervisor that he adequately performed the duties of the forklift driver position, Keown's time study does not conclusively show that Moore was not qualified to perform the duties of the forklift driver position. *See* 29 C.F.R. § 1630.2(n)(3) ("Evidence of whether a particular function is essential includes, but is not limited to . . . (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."). But the study is evidence that prevents Moore's cross-motion from being granted. The issue is what a forklift driver really does on the job.

Accordingly, the Court concludes that a genuine issue of material fact with regard to whether Moore was qualified to perform the essential duties of a forklift driver.[4]

---

[4] Given this conclusion, the Court need not resolve the parties' dispute over whether Dr. Ilka's restrictions are admissible.

### 3. *Reasonable Accommodation*

Moore must also show that Hexacomb denied him a reasonable accommodation. Under the ADA, "reasonable accommodation" includes, among other things, "reassignment to a vacant position." 42 U.S.C. § 12111(9). As the Sixth Circuit has observed, "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified." *Burns v. Coca Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000). The Sixth Circuit has limited this duty, however, in accordance with the regulations: "Employers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual." *Id.*

Moore contends that he requested a reasonable accommodation – that Hexacomb transfer an a forklift driver on the second shift with less seniority than Moore to a laborer position to allow Moore to continue working as a forklift driver. Hexacomb responds that it had decided as part of the temporary cessation of the third shift that no third shift worker would displace a second shift worker. And, it points out, because there were no open forklift driver positions on second shift and it was not legally obligated to displace a second shift worker to accommodate Moore, Moore's requested accommodation was not reasonable as a matter of law. Moore speculates that Hexacomb may have bumped a second shift employee, Dominique Storey, in order to permit Cavner to continue working as a forklift driver. Thus, Moore argues, Hexacomb should have done the same for him. As Hexacomb notes, however, Moore's assertion is based on speculation, not evidence. Rather, the evidence shows that Storey was a forklift driver on second shift at the time the third shift was eliminated, and he continued working as a forklift driver after the two shifts were combined.

Cavner's job was not something that Storey had done, but rather was newly created when the two shifts were combined. (Keown Dep. at 39; Keown 7/13/09 Decl. ¶¶ 3-5.) Apart from Keown, Haight, who was familiar with the details of the temporary consolidation, confirmed that no second shift employee was bumped by a third shift employee.[5] (Haight Dep. at 24.) Thus, Moore's argument lacks evidentiary support.

Moore also contends that Hexacomb created new positions to accomplish its asserted goal of integrating all non-disabled third shift employees into the second shift, but Hexacomb refused to accommodate the only disabled third shift employee – Moore – by not integrating him into the second shift as a forklift driver. Moore contends that it could have placed him into the forklift driver position it assigned to Cavner and placed Cavner into another position. Moore notes that Cavner testified that he would have been willing to move to another temporary position to accommodate Moore. (Cavner Dep. at 26.) Similarly, Moore notes, Hexacomb could have placed him in the position it gave to Haight, which was primarily a forklift driver position. (Haight Dep. at 21-22; Cavner Dep. at 12.)

Hexacomb contends assigning Moore to the position it gave Cavner was not a reasonable accommodation because at the time Moore requested the accommodation, Hexacomb had already determined the job assignments for the third shift employees and there were no open forklift driver positions available. Yet, Hexacomb ignores Nichols' testimony that he told Nadeau that Moore should be given a forklift driver position because of his knees. (Nichols Dep. at 21 (stating that he was concerned that Moore "doing anything other than the fork truck driving job would put him at

---

[5] Moore cites Cavner's deposition testimony to support his assertion that Storey was working as an operator on a line at the time the third shift employees were moved to second shift, but Cavner admitted that he was not certain of when Storey performed certain jobs. (Cavner Dep. at 23.) Thus, Cavner's testimony is based on speculation rather than personal knowledge.

12

risk of injury").) The fact that Nichols, rather than Moore himself, notified Nadeau of Moore's need to work in a forklift driver position is irrelevant, because someone other than the disabled person may request an accommodation on behalf of the disabled person. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999) (stating that "a family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability") (internal quotation omitted) (citing 2 *EEOC Compliance Manual*, Enforcement Guidance for Psychiatric Disabilities, at 20-21); *Linder v. Potter*, No. CV-05-0062-FVS, 2009 WL 2595552, at *6 (E.D. Wash. Aug. 18, 2009) (stating that an employer's obligation to engage in an interactive process to identify reasonable accommodations is triggered "when the employer receives notice, from either the employee or the employee's representative, that the employee is disabled and requests a reasonable accommodation"). This evidence shows that, either through his own knowledge or from his discussions with Haight, Nichols knew that Moore had problems with his knees and required a forklift driver position and advised Nadeau of these facts. "A request for accommodation . . . need not contain any magic words." *Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 660 (8th Cir. 2001). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and the desire for an accommodation." *Taylor*, 184 F.3d at 313. Based upon Nichols' testimony, a reasonable jury could conclude that Nadeau – the decisionmaker – was aware of Moore's disability as well as his need for a specific accommodation prior to assigning positions to third shift employees but failed to engage in the good faith interactive process required under the ADA. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (describing good faith interactive process).

Hexacomb also contends that it had no obligation to assign Cavner's forklift position to Moore because it assigned third shift employees to second shift positions based on their Associate levels, and Cavner's Associate level was higher than Moore's. Hexacomb argues that such legitimate employer personnel decisions do not violate the ADA. However, the Supreme Court has recognized that a request for accommodation may trump an employer's neutral employment policies:

> [T]he Act specifies . ... that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.*, preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.
> Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective. Neutral office assignment rules would automatically prevent the accommodation of an employee whose disability-imposed limitations require him to work on the ground floor. Neutral "break-from-work" rules would automatically prevent the accommodation of an individual who needs additional breaks from work, perhaps to permit medical visits. Neutral furniture budget rules would automatically prevent the accommodation of an individual who needs a different kind of chair or desk. . . . .

*U.S. Airways v. Barnett*, 535 U.S. 391, 397-98, 122 S. Ct. 1516, 1521 (2002). In *Barnett*, the Court held that in the usual run of cases, a seniority system will prevail over a request for an accommodation that conflicts with the system's rules. *Id.* at 404-05, 122 S. Ct. at 1524. Employees' expectations of "consistent, uniform treatment" under seniority systems was a significant consideration in the Court's analysis. *Id.* at 404, 122 S. Ct. at 1524. The Court held, however, that the presumption would not apply in every case and that the employee "remains free to show that special circumstances warrant a finding that, despite the presence of a seniority system . . . , the requested 'accommodation' is 'reasonable' on the particular facts of the case." *Id.* at 405, 122 S.

Ct. at 1525. In this case, unlike the seniority system at issue in *Barnett*, Hexacomb's rule for assigning third shift employees based on Associate level was not a long-standing rule that might be said to have created expectations of consistent, uniform treatment. Rather, the policy was adopted solely in connection with the decision to temporarily discontinue the third shift. Moreover, Moore has presented sufficient evidence – particularly Cavner's testimony that he would have given his forklift driver job to Moore – to show that special circumstances exist in this case, making the requested accommodation reasonable even in light of Hexacomb's work assignment rule.

Finally, the Court concludes that a genuine issue of material fact remains regarding the nature of the temporary positions to which third shift employees were assigned. Hexacomb contends that it had no obligation to displace or bump another third shift employee, such as Cavner, or perhaps Haight, that it had assigned to one of the newly-created second shift positions. The question is whether these employees were actually "assigned" to any particular position. Hexacomb states that it disputes that Cavner was assigned to any particular position, and instead argues that he "was assigned to fill-in where needed on second shift." (Def.'s Br. Supp. Mot. Summ. J. at 7 n.3.) This raises the issue of whether assigning Moore to Cavner's temporary forklift driver position would have actually "bumped" Cavner from that position if Cavner were not assigned to it.

### B. Termination Claim

Before filing a lawsuit, an ADA plaintiff must exhaust his remedies by filing a charge with the EEOC within 180 days of the alleged discrimination (or with the state agency within 300 days). *See* 29 U.S.C. § 12117(a); *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). Federal courts lack subject matter jurisdiction over ADA claims "'unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge.'" *Jones v. Sumser Retirement Vill.*, 209 F. 3d 851, 853 (6th Cir. 2000)

15

(quoting *Abeita v. Trans-Am. Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998)). Although a complainant need not use precise legal terms or wording in filing a claim, "[t]he claim must grow out of the investigation or the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt an investigation of the claim." *Id.* (citing *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)).

Hexacomb argues that the Court lacks jurisdiction over Moore's termination claim because Moore's sole charge of discrimination in his April 14, 2008 Charge of Discrimination was that Hexacomb failed to reasonably accommodate his disability. Hexacomb notes that Moore admits his employment was not formally terminated until July 2008, and because the failure to accommodate predates the termination, the termination falls outside the scope of Moore's failure to accommodate claim. Thus, Hexacomb argues, Moore was required to file a separate Charge of Discrimination as to the termination, which he failed to do. Moore responds that his termination was complete for all intents and purposes when Hexacomb sent him home with the FMLA forms. In other words, the termination arose out of the failure to accommodate because, as a practical matter, no new discriminatory act occurred after the failure to accommodate and the termination at the end of the FMLA leave was a mere formality.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002), the Supreme Court held that a plaintiff must file separate charges for discrete acts of discrimination, such as terminations, failure to promote, denial of transfer, etc. *Id.* at 536 U.S. at 113-14, 122 S. Ct. at 2072-73. Terminations and failures to accommodate are different in nature and, thus, are discrete acts. *Jones*, 209 F.3d at 854. In *Jones*, the plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") that alleged a termination claim. The plaintiff did not allege that the defendant failed to accommodate her disability. The only claim the plaintiff alleged was

16

that the defendant failed to keep the plaintiff's position open while she recovered from her injury. The Sixth Circuit held that the accommodation claim did not "grow out of" the investigation of the plaintiff's termination claim because the claims occurred on different dates – the termination on February 7, 1994, and the failure to accommodate on January 11, 1994 – and that the facts of the two claims differed. *Id.* Moreover, the court observed that the plaintiff attempted to amend her charge to add the accommodation claim only after the OCRC investigated her termination claim and informed her that her claim was denied.

The instant case differs from *Jones* in that the failure to accommodate claim and the termination claim occurred, for all practical purposes, on the same date, when Hexacomb sent Moore home because he could not perform any job available at the facility. In essence, Hexacomb's determination that Moore could not perform any available job due to his indefinite restrictions was tantamount to a termination, even though the FMLA leave had not run. Moore alleged in his Charge that his doctor had cleared him to return to work with restrictions, that Hexacomb put him in a position that he was unable to perform due to his disability, and that Hexacomb told him to leave work until he no longer had the restrictions. Given the fact that the restrictions were permanent, it is reasonable to conclude that the EEOC investigation into the failure to accommodate claim would have disclosed the termination claim. Thus, the Court concludes that the termination claim was properly exhausted.

Hexacomb argues that even if Moore properly exhausted his termination claim, it is entitled to summary judgment because Moore was not a qualified individual. As set forth above, however, Moore was qualified for the position of forklift driver, and genuine issues of material fact therefore preclude summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny both parties' motions for summary judgment..

An Order consistent with this Opinion will be entered.


Dated: November 6, 2009                                   /s/ Gordon J. Quist
                                                                   GORDON J. QUIST
                                                 UNITED STATES DISTRICT JUDGE